Korsmo, J.
¶1 We granted discretionary review of this unduly convoluted and overly lawyered[1] action at the request of the Grant County Superior Court in order to determine if the doctrine of quantum meruit recognized in Bignold v. King County, 65 Wn.2d 817, 399 P.2d 611 (1965), still has application after the decision in Mike M. Johnson, Inc. v. Spokane County, 150 Wn.2d 375, 78 P.3d 161 (2003), upheld contractual notice and waiver provisions in government construction contracts. In the published portion of this case, we conclude that Bignold remains viable after Johnson for matters not included within the contract and affirm the trial court’s rulings on that point. In the unpublished portion, we affirm the majority of the trial court’s remaining summary judgment rulings, reverse some, and remand this interlocutory appeal for trial.
FACTS[2]
¶2 This case arises from a contract to build a fish ladder into the Wanapum Dam on the Columbia River immediately south of Vantage, Washington. The dam was built *701 between 1959 and 1963, and required the abandonment of the former Vantage town site and its relocation above the new high water levels. The dam was constructed for Public Utility District No. 2 of Grant County (PUD).
¶3 The dam was built with 16 intake units designed to house large, power-generating turbines. Six of those units were left open for future expansion of the dam’s power-generating capacity. The dam was designed as a “gravity dam” that is built to withstand upstream water pressure by its own weight. Thirteen anchor tendons help support each of the expansion units of the dam since those units do not have sufficient weight to withstand the water pressure. The anchor tendons consist of steel cables anchored into the upstream bedrock.
¶4 In the early 2000s, PUD decided to construct a fish bypass in Unit 11, an expansion unit containing three separate slots. It then contracted with an independent firm, Jacobs Engineering, to do some preliminary analysis in anticipation of soliciting bids for the project. Jacobs Engineering produced a series of reports analyzing general, presumptive methods of construction. Based on those reports, PUD produced and disseminated bid specifications. General Construction Company (GCC) and other potential bidders met with Jacobs Engineering to go over that material in preparation for bidding.
¶5 Ultimately, PUD awarded the contract to GCC to perform “all work necessary for the Construction of Wana-pum Future Unit Fish Bypass.” Clerk’s Papers at 19583. The nearly 430 page contract contains many provisions relevant to this litigation. Among the most pertinent to this opinion are provisions that (1) made the overall project engineer the primary contact person between GCC and PUD, (2) allowed the engineer to approve or direct minor changes to the construction process, (3) required PUD management approval for changes costing more than $10,000, (4) required all change requests from GCC be in writing if payment was expected for the change, (5) and *702 stated that GCC’s failure to submit a written request for damages within ten days waived the right to payment for those damages.
¶6 Regulations promulgated by the Federal Energy Regulatory Commission (FERC) require periodic inspection of dams by independent consultants to analyze potential and actual deficiencies. 18 C.F.R. § 12.32. Pursuant to this requirement, PUD periodically contracted with independent engineering firms to conduct potential failure modes analysis of the dam (PFMA). As a result of the periodic analyses, PUD and FERC constantly monitored the dam for any signs of failure. The most recent analysis prior to the fish bypass project was conducted in late 2004 by Acres International.
¶7 Since at least the mid-1980s, PUD and FERC have been aware that the anchor tendon construction method may result in the anchors becoming weakened by the corrosive effects of water. Consequently, the PFMAs have all assessed this possibility and its repercussions. Because of the severity of the consequences, FERC classified this potential failure mode as a “Category I: Highlighted Potential Failure Modes.” However, they have been unable to ascertain the likelihood that any corrosion has in fact occurred.[3] Following completion of the project, GCC obtained these reports from FERC through a Freedom of Information Act request. 5 U.S.C. § 552.
¶8 Just as no plan of battle survives first contact with the enemy,[4] it appears no plan of construction survives first contact with the elements. Accordingly, original plans must be revised to address the changed conditions. That was certainly *703 the situation with the Wanapum Dam fish ladder project. Change was constant; the building process saw numerous changes to the projected course of the construction. For instance, although the PUD had anticipated the three slots in Unit 11 would be worked on sequentially, GCC bid the contract to work on the first two slots simultaneously and commenced work according to that approach.[5] However, when Unit 11 moved during construction, tilting very slightly before stabilizing, the engineer ordered GCC to cease simultaneous work and proceed sequentially, delaying the project and driving up GCC’s expenses. Many additional changes, some formally requested by GCC and some not, as well as changes directed by the engineer, occurred. GCC also did not submit timely damage claims on some of the changes. Under a partial settlement reached in 2007 during the construction, PUD paid GCC extra for some changes and denied payment for others.
¶9 After the project was completed, GCC initiated this litigation addressing the damage claims that were not resolved by the settlement. Ultimately, the matter was assigned to the Honorable John Knodell. Over the course of several years, the parties argued the motions at issue in this appeal. By well-analyzed and thoughtful rulings, the trial court eventually granted partial summary judgment to PUD on several of GCC’s damages claims and denied summary judgment on other claims. Similarly, GCC sought to challenge some of the factual bases for the contract and establish that PUD had waived compliance with the contract’s notice provisions; those efforts failed.
¶10 Nonetheless, the trial court was concerned with the question of how strictly to apply the notice and claim provisions of the contract, with particular concern over whether PUD had to establish prejudice in order to rely on the notice and claim provisions. To that end, the trial court *704 urged this court to grant review in order to resolve that specific legal contention and certified its partial summary judgment rulings for appeal. This court granted both PUD’s motion for discretionary review and GCC’s cross motion. The matter eventually proceeded to oral argument.
ANALYSIS
¶11 The parties understandably frame their arguments under expansive readings of the case most favorable to their position, with PUD emphasizing Johnson and GCC relying on Bignold. We think it is quite possible to give effect to both cases.
¶12 This court reviews orders on summary judgment de novo, and will perform the same inquiry as the trial court. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). All facts and inferences shall be considered in the light most favorable to the nonmoving party. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate where there are no material facts at issue and a party is entitled to judgment as a matter of law. Lybbert, 141 Wn.2d at 34.
¶13 Bignold involved a construction project to build a road in King County. The contractor, Bignold, was required to build the road in segments, using materials cut from one portion of the roadway as embankment for subsequent portions. 65 Wn.2d at 819. As with this case, a government-employed engineer had responsibility for directing the project. Id. The primary[6] problem that developed was the discovery that large sections of the excavated material were too wet and contained too many boulders to be used for embankment. As a result, the contractor was ordered by the engineer to remove and dispose of the unsuitable material and find replacement material. Id. These changed require- *705 merits slowed the project down and imposed increased expenses for both the unexpected disposal and for having to obtain materials from a greater distance at a greater expense.
¶14 The county paid for only a portion of the additional work it directed Bignold to undertake. Id. Bignold sued under a theory of quantum meruit and prevailed on the claims related to the subsurface conditions. Id. at 819-22. The Washington Supreme Court affirmed. In the course of its opinion, the court discussed two issues of particular import to this case. First, after noting that the contract required the contractor to give written notice of changed subsurface conditions to the county, the court upheld a trial court finding that the contractor had given “ ‘timely notice of the subsurface conditions on the job site.’ ” Id. at 821, 822. The county had been alerted to the changed conditions as soon as they were discovered and ordered the contractor to perform changes. Id. at 822. “Under such conditions, the county cannot defeat recovery by a contractor even if no written notice was given.” Id. Second, the court expressly rejected King County’s argument that the doctrine of quantum meruit had no place in an action on a contract. Id. at 826. Instead, the court expressly found it available to the subsurface condition problems, and that it was “an appropriate basis for recovery when substantial changes occur which are not covered by the contract and were not within the contemplation of the parties, if the effect is to require extra work and materials or to cause substantial loss to the contractor.” Id.
¶15 Johnson involved a contract between Spokane County and Mike M. Johnson Inc. to construct sewers on two separate projects in the Spokane Valley. 150 Wn.2d at 378. Although the parties expected that Johnson would work on the projects sequentially, the county had the ability to direct which streets to work. Id. Both contracts required Johnson “to use mandatory notice, protest, and formal claim procedures for claims of additional compensation, time ex *706 tensions, and changed conditions.” Id. at 379. Problems developed when one of the streets needed to be redesigned and buried telephone lines unexpectedly were discovered. Id. at 378-79. As a result, the county changed the order of streets that Johnson was to work and directed project changes to the street being redesigned; it paid Johnson for the extra expenses of that component of the project, but not for increased expenses to the entire project. Id.
¶16 More changes followed and Johnson noted its unhappiness with the delay and constant change orders, and also indicated that it was incurring additional costs. Id. at 380-81. However, it did not follow the contract provisions for protest and for claiming additional compensation, despite the county’s written indication that Johnson needed to comply with the contract’s provisions. Id. at 381-82. After extensive negotiations failed, Johnson eventually filed suit seeking damages; the county defended on the basis that Johnson had failed to comply with the contract. Id. at 384. The trial court ultimately granted summary judgment in favor of the county and Johnson appealed. Id. at 384-85. This court reversed, deciding that material questions of fact existed concerning whether the county’s “actual notice” excused Johnson from complying with the contract. Id. at 385. The Washington Supreme Court granted review and reversed in a 5 to 4 decision.
¶17 The majority concluded that there was no “actual notice” exception and that, instead, contract requirements would “be enforced absent either a waiver by the benefiting party or an agreement between the parties to modify the contract.” Id. at 386-87 (citing cases rejecting claims where contractor had not complied with contractual notice provisions). The court expressly rejected Johnson’s argument that Bignold had created an actual notice exception. Id. at 387-88 (quoting Bignold, 65 Wn.2d at 822). It read Bignold as reaffirming “the long-established rule requiring contractors to follow contractual notice provisions unless those *707 procedures are waived by the owner.” Id. at 388. It then discussed the cases relied on by Johnson as examples of waiver. Id. The majority found that Johnson did not comply with the notice and claim provisions of the contract and that the county did not waive its reliance on those provisions. Id. at 390-92.
¶18 By contrast, the dissent, authored by Justice Chambers, argued that it was unfair to require Johnson to comply with the claims procedure when the county had been fully informed about the problems and observed the work performed. Id. at 393. The dissent agreed that more than actual notice was required to waive compliance with a contract provision. Id. at 400. The dissent read Bignold as creating a rule that the failure to comply with the “claims procedures will not defeat the contractor’s right to compensation unless that procedural error causes prejudice to the owner.” Id. In support of that statement, the dissent cites Bignold, 65 Wn.2d 817. Johnson, 150 Wn.2d at 400. That page, however, is the title page for the opinion and contains three of the nine headnotes for the case. See 65 Wn.2d at 817. Thus, the dissent appears to simply be citing Bignold in passing. However, headnote three from that page might also bear on the issue. It states:
Same—Construction—Formal Notice Requirement— Actual Notice. The fact that a contractor did not give written notice of changed conditions, as required by the contract, did not prevent his recovery for the cost of extra work required by conditions which had not been anticipated by the contracting parties, where the person for whom the work was being done had become immediately aware of the changed conditions as soon as they developed, and had ordered the contractor to perform the extra work involved.
Id. at 817-18.
¶19 Our issue arises against this backdrop due to the trial court’s concern whether the position of Justice Chambers might have any traction. For several reasons, we think it has none in this case.
*708 ¶20 First, this case is factually closer to Johnson than to Bignold because the contract at issue in Johnson expressly imposed duties on the contractor to give written notice and follow a specific written claim procedure, as does the contract here. The notice requirements, if any, in the Bignold contract are discussed very little, and whether the contractor complied with them is discussed even less. The only notice provision mentioned in the opinion involved the requirement that the contractor notify the county about changed subsurface conditions. 65 Wn.2d at 821. The trial court’s finding that the contractor had given that notice was upheld. Id. at 822. If there were any other notice provisions at issue, they simply were not discussed.[7] Bignold does not provide implicit factual authority for the proposition that contractual notice provisions were at issue there, let alone any authority that they can be ignored.
¶21 Second, the Bignold passage on page 822 cited for the proposition that lack of compliance with notice requirements is not a bar to recovery[8] is not a statement of the facts of that case. Rather, the passage expressly cites to two 1941 federal cases that did state that rule of law. This passage simply should be read as a general statement of law rather than as the governing rule of the case. It would be no more than dicta if viewed as a ruling on the issue of compliance with contractual notice provisions in Bignold and likely would be in conflict with Johnson if treated as such.
¶22 Finally, it should go without saying that a dissenting opinion is not law.[9] While GCC can properly urge that Justice Chambers’ opinion be adopted, this court is not *709 the place to make that argument. We are bound by the majority opinion in Johnson. E.g., State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). The Johnson majority speaks squarely to the validity of contractual notice and claim provisions—they are valid unless the party in whose favor the provisions act waives the protection. Johnson, 150 Wn.2d at 391-92. There must be unequivocal evidence of an intent to waive. Id. at 391. Bignold’s oblique reference to the topic has no bearing on the issue in light of Johnson.
¶23 Bignold, however, is still good law for its actual holding that quantum meruit has a place in litigation arising from a construction contract. 65 Wn.2d at 826. It applies to “substantial changes” beyond the contemplation of the parties and not covered by the contract that result in extra work or substantial costs to the contractor. Id. Thus, in Bignold, the doctrine applied to the costs incurred when the subsurface conditions, duly reported by the contractor upon discovery, varied significantly from that expected by the parties and led to increased costs for finding new fill and the removal and transportation of the saturated materials. Id.
¶24 Giving effect to both Bignold and Johnson, we discern the following rules. First, for work within the scope of the contract, which here was “all work necessary for the Construction of Wanapum Future Unit Fish Bypass,” the terms of the contract must be complied with unless there is evidence that PUD waived compliance with the notice and claim requirements. For work outside of the contract,[10] and changed work within the scope of the contract where GCC satisfied the contractual notice and claim provisions, quantum meruit applies and entitles GCC to compensation. In *710 essence, Bignold provides a supplemental means of recovery when the contract is not applicable.[11]
¶25 The trial judge typically took this approach to the various claims presented. An example involved a contractual requirement that an inspector certified by the National Association of Corrosion Engineers (NACE) oversee the painting of the flow fairing modules that were to be inserted in the fish bypass.[12] GCC asked that it be allowed to use an internal quality assurance manager employed by one of its subcontractors. That individual, however, was not NACE certified and PUD declined to waive the certification requirement. GCC then hired an outside inspector who had NACE certification at a cost of $67,000.
¶26 It later sought reimbursement from PUD for this expense in this litigation. The trial court dismissed the claim on the grounds that GCC had failed to notify PUD of the claim when it arose. Although GCC contends that PUD modified the contract by requiring a third-party inspector, the record does not support the claim.[13] The contract always required a certified inspector without mandating that the person be an independent employee.
¶27 The trial court correctly concluded that the Selway claim was barred by the failure to provide timely notice to the PUD. We affirm the dismissal of that claim.
¶28 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, *711 having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
Siddoway, J., concurs.

 Despite the fact that this case comes to us from rulings on motions seeking partial summary judgment, the clerk’s papers tally 20,605 pages. Much of the record is duplicative and unnecessary. Our commissioner’s office also has been subjected to repeated motions before discretionary review was sought as well as after review was granted. While it is debatable whether Public Utility District is a substantially prevailing party, it is undebatable that both sides have contributed to the excessive litigation. Accordingly, we exercise our discretion under RAP 14.2 and deny costs and fees on appeal.

 Most of the facts necessary to the resolution of the remaining issues will be detailed in the unpublished portion of this opinion in conjunction with the discussion of those issues.

 Wanapum Dam has been in the news in the last few years because of cracks that occurred after completion of the fish bypass construction project. There is no indication in our record that the cracking problem is related to either the construction project or the anchoring method.

 Attributed to Field Marshall Helmuth von Moltke in his 1871 essay, “On Strategy,’’ reprinted in Moltke on the Art of War: Selected Writings 45-47 (Daniel J. Hughes ed., 1993).

 PUD does not agree that the contract authorized the two slot approach, but we view the facts on this issue in the light most favorable to GCC, the nonmoving party.

 Other successful claims in the case involved costs imposed by a stop work order and costs incurred when the engineer required the contractor to work under bad weather conditions. Bignold, 65 Wn.2d at 823-26.

 In the event the headnote states a fact that is not included in the opinion, we simply note that headnotes are not prepared by the court and do not constitute authority. United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S. Ct. 282, 50 L. Ed. 499 (1906).

 And which subsequently became headnote 3.

 But, for those who do need a citation for that proposition, please see Cole v. Harveyland, LLC, 163 Wn. App. 199, 207, 258 P.3d 70 (2011) (“[T]he meaning of a majority opinion is not found in a dissenting opinion.”).

 For instance, if PUD had required GCC to repair or replace an anchor tendon, the work would have been outside of the scope of the contract to build the fish passages.

 GCC sees Bignold as providing an alternative theory of recovery rather than merely a supplemental one. We reject that approach.

 The production of the modules was subcontracted to Selway Corporation. The parties identify this issue as “Claim 12’’ or as “the Selway claim.’’

 GCC also argues here, as it does in all instances where the court determined that a claim was not timely raised under the contract, that PUD had waived the notice and claim requirements. We address, and reject, that argument in the unpublished portion of this opinion.