# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PEASE & SONS, INC., a Washington corporation, | No. 58748-3-II |
| Respondent, | |
| v. | |
| TURNER CONSTRUCTION COMPANY; | UNPUBLISHED OPINION |
| Appellant. | |
| LIBERTY MUTUAL INSURANCE COMPANY, Bond No. 015050441 and Bond No. 015050440; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Bond No. 106425855 and Bond No. 106425854; FIDELITY AND DEPOSIT COMPANY OF MARYLAND / ZURICH AMERICAN INSURANCE COMPANY, Bond No. 9194346 and Bond No. 9194345; FEDERAL INSURANCE COMPANY, Bond No. 8239-43-69 and Bond No. 8239-43-68; THE CONTINENTAL INSURANCE COMPANY; Bond No. 929626860 and Bond No. 9296266859; XL SPECIALTY INSURANCE COMPANY, Bond No. US00073098SU16A and Bond No. US00073097SU16A; METROPOLITAN PARK DISTRICT OF TACOMA, WASHINGTON, | |
| Defendants. | |
| PEASE & SONS, INC., a Washington corporation, | |
| Third-Party Plaintiff, | |
| v. | |
| GERDAU REINFORCING STEEL, a general partnership, and CMC STEEL FABRICATORS, INC., a foreign corporation, | |
| Third-Party Defendants. | |

CHE, J. — Turner Construction appeals a bench trial judgment awarding its subcontractor, Pease & Sons, claims for overtime, attorney fees, and costs.

Metropolitan Park District of Tacoma (MetroParks) hired Turner as the prime contractor to build the Pacific Rim Aquarium. Pease submitted a bid for the concrete construction work on the aquarium. To submit a bid, Pease had to accept Turner's subcontract without modification, which included a term limiting the time to bring a breach of contract claim to within one year of a subcontractor's substantial completion of its work. The information given to prospective bidders included Turner's proposed schedule for the project, which did not factor in requirements from MetroParks such as how long concrete had to cure before supporting forms could be removed, and requirements for the design of the aquarium tanks that increased the complexity of construction. Turner hired Pease to complete the concrete work.

The project experienced delays and fell far behind Turner's planned schedule. At Turner's direction, Pease and other contractors worked overtime to try to mitigate the delays. Turner blamed Pease and other subcontractors for the delays, while the subcontractors blamed Turner's misleading scheduling. Pease finished its work on the project in early 2018, but MetroParks did not certify that the aquarium was substantially complete until June 2018.

In April 2019, Pease sued Turner for overtime and other claims stemming from breach of the subcontract. Turner counterclaimed against Pease for breach of the subcontract. After a bench trial, a trial court dismissed Turner's counterclaims and awarded Pease damages for overtime, while dismissing Pease's other claims due to waiver and failure to comply with

subcontract notice requirements. The trial court also awarded Pease attorney fees, costs, and prejudgment interest.

Turner appeals, arguing that (1) Pease filed its complaint outside the one-year limitation period in the subcontract, (2) the trial court erred by ruling that the subcontract limitation period was unconscionable and unenforceable, (3) Pease did not adequately notify Turner of its overtime claims, (4) Pease waived its overtime claims through lien releases in pay applications, (5) "pay-if-paid" clauses in the subcontract limited Pease's recovery, and (6) the trial court erred by awarding Pease attorney fees and costs. Pease responds that Turner waived its contract limitation period, lien release, and "pay-if-paid" defenses. Both parties seek appellate attorney fees and costs.

We affirm. We hold that the trial court's findings supported its conclusion that Pease's claim was timely. Because we affirm on this ground, we need not reach the questions about whether the contract limitation period was unconscionable or whether Turner waived that defense. Further, substantial evidence supported the trial court's findings that Turner directed Pease to work overtime, that Pease did not have to separately notify Turner of the costs of working overtime, and that Pease did not waive its overtime claims through lien releases. Overall, we hold that the trial court's findings supported its conclusions that Pease was entitled to damages for overtime. And the "pay-if-paid" clauses do not limit Pease's recovery. Finally, we hold that the trial court did not err by awarding Pease attorney fees and costs, we deny Turner's request for appellate attorney fees, and we grant Pease's request for appellate attorney fees and costs.

3

No. 58748-3-II

FACTS

I. BACKGROUND

A.    *Bid Process*

MetroParks is a municipal corporation that manages recreation sites and services around Tacoma, including the Point Defiance Zoo.  Turner is a New York corporation that performs construction work in Washington.

In 2015, MetroParks hired Turner as general contractor/construction manager (GM/CM) to lead construction on the new Pacific Rim Aquarium at the Point Defiance Zoo & Aquarium. Turner had retainage and performance bonds with Liberty Mutual Insurance Company, Travelers Casualty and Surety Company of America, Fidelity and Deposit Company of Maryland/Zurich American Insurance Company, Federal Insurance Company, The Continental Insurance Company, and XL Specialty Insurance Company (collectively, "the Sureties").

1.    *Prime Contract*

The prime contract between Turner and MetroParks "required Turner to provide recommendations to Metro Parks on constructability, construction time requirements, construction and construction trades phasing and coordination, [and] a site work plan and work schedule."  Clerk's Papers (CP) at 1734 (Findings of Fact (FOF) 32).  Turner also had to solicit subcontractors for each "bid package" of trade work (such as excavation, concrete, mechanical, electrical, and plumbing) that the project required.  And the prime contract required Turner to manage construction, including "scheduling the construction work and coordinating [] all subtrade work."  CP at 1734 (FOF 32).

The prime contract provided that the aquarium would "be deemed Substantially Complete when the tank exhibits have been completed, tested, commissioned[,] and accepted by the Owner as ready to accept introduction of live marine animal wildlife specimens and the Owner's staff may occupy the building." Ex. 91 at 221.

MetroParks also imposed constraints on how the aquarium was to be built. These constraints included a prohibition on using shotcrete (a kind of concrete that is sprayed instead of poured) in tank walls; a prohibition on horizontal joints between concrete slabs in the tank walls, which made pouring those walls more complex; and requirements that concrete cure for 7 days in architectural walls and 14 days in tank walls before supporting forms could be removed.

2.      *Concrete Work Bid Manual*

Turner provided informational bid documents to prospective bidders for roughly 30 bid packages of subtrade work. The bidding manual for the concrete package included a preliminary "rolled up" schedule and work sequence. The "rolled up" schedule summarized each component of the project, but did not include every individual activity, or all of the tasks that other non-concrete subcontractors would need to perform. The bid manual materials did not factor in the shotcrete and horizontal joint prohibitions or the cure time requirements, even though Turner knew about those constraints and that MetroParks would not relax the constraints. This schedule appeared to anticipate that Pease's scope of work would take 321 days.

Pease bid for the concrete package and was awarded the subcontract in July 2016. The price of the subcontract was roughly $6.2 million. Pease hired Gerdau Reinforcing Steel[1] as a subtier subcontractor to provide rebar and other reinforcing steel on the aquarium.

3. *Subcontract Provisions*

To submit a bid for the concrete package, bidders had to "[r]ead and accept[] Turner's contract form (unmodified)," which became part of the subcontract. CP at 1739-40 (FOF 66). Thus, Pease agreed to the following conditions when it bid on the concrete package.

Article I required Pease to perform its work in "strict accordance" with MetroParks' specification and "the terms and provisions of the General Contract" between MetroParks and Turner, which was part of "the Contract Documents" for the subcontract. CP at 135.

Article III addressed overtime. The article first provided that if Pease or its subcontractors caused a delay, Pease had to work overtime at its own expense. It also stated that Turner could direct Pease to work overtime. The article provided that Turner would pay Pease the cost of the overtime as long as Pease was not in default under the subcontract and the direction to work overtime was not due to any fault or failure of the subcontractor. It did not require Pease to give Turner any special notice about the cost of overtime.

Article V covered delays and extensions of time. It provided that, if Pease experienced delays that were not its fault, it could get more time to complete its work as long as it notified Turner within 48 hours of the start of the delay and demonstrated "that it could not have anticipated or avoided such delay." CP at 138.

---

[1] Gerdau merged with CMC Steel Fabricators in 2021 and became CMC Rebar West, but was primarily referred to as Gerdau throughout proceedings.

Article IX addressed change orders that altered Pease's scope of work. The article required Pease to provide Turner written notice of "any circumstance or direction given by Contractor which Subcontractor may regard as a change, addition and/or omission or which may otherwise serve as the basis for a request for an increase in Price or extension of time within 5 days of" the change in circumstance or direction. CP at 139. Article IX also stated that if the parties could not agree on the value of the change in work, Pease was to proceed with the work, "and the determination of the value of the work, if not resolved in the normal course, shall be addressed pursuant to the dispute resolution procedures in accordance with Article XVIII." CP at 139.

Several provisions in the contract contained "pay-if-paid" provisions limiting Pease's ability to secure payment for delays or extra work. Article IV stated that Turner's obligation to pay Pease "for extras or change orders or delays to the Work, is subject to the express condition precedent of payment therefor by the Owner." CP at 136. Article V required Pease to agree that it was not entitled to compensation or damages "for any delay . . . except to the limited extent that Contractor has actually recovered corresponding cost reimbursement, compensation[,] or damages from the Owner." CP at 138. Likewise, Article IX barred Pease from claiming "damages or extensions of time attributable to any changes, additions and/or omissions directed by Contractor except to the limited extent that Contractor has actually recovered corresponding cost reimbursement, compensation, damages or extensions of time from the Owner under the Contract Documents for such changes." CP at 139.

Article XVIII addressed disputes. The first paragraph of the article required the parties to participate in mediation to resolve any dispute "as a condition precedent to addressing the

dispute in any other forum unless Contractor agrees in writing to waive this condition

precedent." CP at 142. The second paragraph required Pease to continue work during the

pendency of any dispute, including mediation or litigation. CP at 143. And the third paragraph

imposed a time limit:

> All claims, suit[s] or demands by Subcontractor as against Contractor or Owner shall be brought within the earlier of one year following Subcontractor's achieving substantial completion for the Subcontractor's Work or within one year of Contractor's notice of default in the event that Contractor has taken any action in accordance with Article XI [regarding default by Pease], and Subcontractor hereby agrees that all relevant statutes of limitations shall be deemed reduced to such time period, to the fullest extent permitted by law.

CP at 143. The subcontract did not define when Pease's work would be substantially complete.

B.    *Construction*

1.    *Delays*

In July 2016, Turner provided Pease an "unrolled" project schedule that included some

additional work and constraints that the preliminary "rolled up" bid package schedule omitted.

The "rolled up" schedule was two pages long; the "unrolled" schedule was seven pages. The

"unrolled" schedule anticipated that Pease would complete its scope of work for the structural

concrete in 220 days, in contrast to the 321 days allocated in the "rolled up" schedule.

Construction was hindered almost immediately, due to MetroParks issuing a late notice to

Turner to commence construction and a delay in obtaining a necessary permit from the city.

Pease encountered further early delays because of problems regarding the design of a crane and

excavation for and construction of the crane's footings at the site, prior to Pease performing its

work. Pease notified Turner of the schedule impact from these delays, and Turner's remedy

included directing Pease to work overtime. Construction was also significantly delayed later on

by faulty work of a roofing/framing subcontractor, delays in the delivery of the aquarium tanks, and leaks in the tanks throughout late 2017 and early 2018.

By November 2016, Pease had submitted seven different schedules for its work to Turner, none of which included the work of other trades because Turner had not shared that information, and none of which contemplated finishing Pease's work within 220 days. Turner did not reject Pease's last schedule, submitted November 28, but rather shortened Pease's proposed work duration by 10 days and then incorporated Pease's schedule into a January 2017 master schedule. This master schedule still did not include all of the work other subcontractors would need to do before and after Pease's work. Numerous subcontractors complained about Turner's failure to provide an accurate or workable master schedule, which resulted in multiple subcontractor teams working in close quarters or not being able to work when scheduled, further delaying the project.

Turner directed Pease to work overtime several times throughout construction. Additionally, Turner began conducting "pull planning" meetings to sequence work, but the results of these meetings were never incorporated into the master schedule, causing confusion and inefficiencies. CP at 1760 (FOF 200). In August 2017, Turner sent Pease a notice of default blaming Pease for the project delays.

Pease performed its last major pour on the project on September 27, 2017, when it poured a piece called the "chiller slab." 5 Report of Proceeding (RP) (Oct. 3, 2022) at 850. Turner's master schedule planned that pour for August 15, 2017. Pease performed additional minor work on the project through at least March 2018 and possibly May 2018.

9

Throughout construction, Turner sent MetroParks change order requests from Pease and other subcontractors. Many change order requests for work Pease did in the summer of 2017 were not sent to MetroParks until late 2017, and some as late as spring 2018.

2. *Pay Applications and Lien Releases*

Throughout the project, Pease sent Turner pay applications that Turner would submit to MetroParks for payment. The pay applications contained conditional and unconditional lien releases.

The conditional release stated that, when Pease received the amount in the pay application, "this document shall become effective to release any mechanic's lien, stop notice, or bond right the undersigned has on the project." 5 RP (Oct. 3, 2022) at 854-55. The unconditional release stated that the total amount Pease had received at the time of the relevant pay application "does hereby release pro tanto any mechanic's lien, stop notice, or bond right that the undersigned has on the above-referenced job." 5 RP (Oct. 3, 2022) at 855. After the release language, the pay applications stated, "This release covers a progress payment for labor, services, and equipment or materials furnished to the project through [a designated date]." 5 RP (Oct. 3, 2022) at 855.

The pay applications further provided that the release covered payment to Pease "for all labor, services, equipment, or materials furnished on the job, except for disputed claims for additional work." 5 RP (Oct. 3, 2022) at 855. The forms had a space where Pease could enter a figure for the disputed amount, and Pease wrote "zero" in that space for all the pay applications covering the time period that Pease claimed to have been impacted by delays. CP at 1745 (FOF 98).

3. *Claims Related To Delays*

In November 2017, Pease sent Turner a "schedule impact claim" in Change Order Proposal 35 (COP 35), seeking additional compensation of roughly $1.2 million for delays dating back to 2016. CP at 1766 (FOF 250, 255). This included claims for overtime.

In late 2018 and early 2019, Turner and MetroParks executed Change Orders 9 and 10 under the prime contract, which were a "global settlement" of the project's scheduling and financial issues between those two entities. 12 RP (Oct. 13, 2022) at 2242. The settlement documents gave Turner money on behalf of Pease and other subcontractors. And the settlement stated, "Turner shall have the full and complete responsibility to resolve at its own cost all claims or liens asserted or pursued by [Turner's] employees, Subcontractors[,] or suppliers . . . arising out of or related to the Project." Ex. 229 at 3.

As part of the settlement, MetroParks certified that the aquarium was substantially completed in June 2018, roughly four months behind schedule, triggering liquidated damage provisions for Turner. The certificate of substantial completion for the aquarium stated that the date of substantial completion was "also the date of commencement of applicable warranties" for the trades, meaning that warranties for Pease's work on the aquarium began to run in June 2018. Ex. 430 at 1.

## II. LAWSUIT

Before filing any lawsuit, Pease requested mediation with Turner in late 2018, as required by Article XVIII of the subcontract. It is not clear from our record whether Turner ever responded to this request to mediate.

In April 2019, Pease sued Turner for breach of contract and unjust enrichment, including claims against the Sureties' retainage bonds. Turner counterclaimed against Pease for breach of contract, and Pease then cross-claimed against its subcontractor Gerdau "[t]o the extent Turner's counterclaim allegations are valid." CP at 32. Gerdau then counterclaimed against Pease for breach of contract and cross-claimed against the Sureties' bonds.

Turner's answer asserted Pease's "'claims [were] barred by [the] applicable statute of limitations,' and . . . '[were] barred, in whole or in part, by set-off or waiver.'" Resp't's Br. at 34.

In August 2019, Pease again requested mediation, and in 2020 the parties stayed litigation to engage in mediation, which was unsuccessful.

In 2022, in response to interrogatories asking about Turner's affirmative defenses, Turner stated that Pease failed to comply with subcontract notice requirements for its claims and waived its claims by breaching the contract. And Turner's responses indicated that its affirmative defense that Pease's claims were "offset" related to "outstanding changes which Turner has approved for payment." CP at 1653.

A.      *Summary Judgment*

In 2022, Turner moved for summary judgment, asking the trial court to dismiss Pease's claim for unjust enrichment and all claims related to COP 35's schedule impact claim. Specifically, it argued that Pease failed to present the schedule impact claim in accordance with the subcontract's notice provisions in Article V and IX, thereby waiving the claim.

Pease did not oppose the motion to dismiss the unjust enrichment claim, and the trial court dismissed that claim. But Pease argued that there were genuine issues of material fact such

12

as whether Turner breached its contract obligations, and whether Pease complied with various notice provisions.

For the schedule impact claim, the trial court concluded that there were genuine issues of material fact such as whether the timing of Pease's delivery of the schedule impact claims waived those claims. There were also questions of material fact about whether the late delivery was "excused by Turner's role in alleged[ly] untimely responding" to requests for information, or if Turner forfeited its ability to enforce the subcontract notice requirements by allegedly breaching the subcontract. CP at 1242.

B.    *Arguments at Trial*

At trial, witnesses testified consistently with the facts above. Any discussion about the definition of "substantial completion" related solely to when the aquarium as a whole was "fish ready;" there was no testimony about when Pease's work was substantially complete. *See* 8 RP (Oct. 6, 2022) at 1432-33; 11 RP (Oct. 12, 2022) at 1928; 12 RP (Oct. 13, 2022) at 2236-41; 13 RP (Oct 17, 2022) at 2292, 2432. Turner's project manager testified that Pease was still installing concrete until late March 2018, and Pease's project manager testified that Pease workers were at the site until May 2018.

Turner primarily argued that Pease should not have relied on Turner's proposed schedule at bidding, and should not have bid for the project unless it knew it could build the project in time. Turner also argued that Pease failed to satisfy the subcontract's notice requirements for filing claims, and waived its claims by executing the conditional and unconditional lien releases in the pay applications. Turner further asserted that Pease's claims were barred by the subcontract's one-year limitation provision, reasoning that Pease substantially completed its

work in September 2017 and did not file the lawsuit until April 2019. Turner also asked Pease's project manager about Article V and IX's "pay-if-paid" clauses to argue that the clauses limited Pease's recovery to the amount Turner received from MetroParks for the unresolved change orders.

Pease argued that, because Turner breached the subcontract by failing to properly schedule or manage the project, Turner could not enforce the subcontract's notice provisions. And Pease reasoned that it substantially complied with the notice procedures anyway because delays in notice of impacts were a product of Turner's confusing scheduling.

During the trial, Pease filed briefing arguing that Turner waived its limitation period and lien release defenses by failing to directly assert them before trial. Pease also argued that it filed its complaint within one year of the aquarium being substantially complete, and insisted that Turner had "produced no evidence that it notified Pease that the concrete work was substantially complete." CP at 1587.

C.    *Trial Court's Ruling*

    1.    *Background Findings*

The trial court found that the prime contract between Turner and MetroParks required Turner to manage "scheduling the construction work and coordinating of all subtrade work on the Project to its completion." CP at 1734 (FOF 32). This included updating the master schedule monthly or as changes or issues arose.

The trial court found that the construction work plan and sequencing model in the bid manual "contained assumptions and means or methods that were not consistent with the Project design and the Project construction constraints implemented by MetroParks" regarding shotcrete,

horizontal joints in tanks, and cure times. CP at 1737 (FOF 52). And the trial court found that "Turner employees knew MetroParks was not going to amend the aforementioned constraints" when Turner published the bid manual. CP at 1738 (FOF 54). "Despite having such knowledge, Turner did not revise the Bidding Manual work plan or schedule or bid model to reflect the same; and Turner did not notify the owner (or ask for more Project time) or notify Pease and the other concrete bidders or revise the bid schedule or model." CP at 1738 (FOF 55).

The trial court found that, while Pease was responsible for sequencing and timely performing its work, "under the Subcontract, Pease had no authority to update and distribute the Project's work schedules or sequence the work of any other subcontractors, which authority and duty was Turner's alone." CP at 1741 (FOF 81). The trial court found that "Pease fulfilled its Sub-contractual obligations relating to providing sequencing and scheduling" while "Turner failed to provide necessary scheduling information or provide timely direction," which delayed all subcontractors. CP at 1759 (FOF 186, 190). The trial court found that Pease was not responsible for delays attributable to other subcontractors, for other subcontractors' claims that had been assigned to Turner, or for cracking in the tanks that significantly delayed the project's completion.

The trial court found that Turner delivered a notice of default to Pease in August 2017, and that "Pease first quantified the amount of days (impact)" from the scheduling delays in COP 35 in November 2017. CP at 1761 (FOF 207, 208).

The trial court found that Pease's last day on the project was in May 2018 and that Pease timely filed its complaint. It also found, "There was no evidence that the one-year limitation date or period was a specifically negotiated term of the Subcontract." CP at 1761 (FOF 206).

The trial court concluded, "Turner failed to satisfy its burden of proof that the Pease Complaint is time barred; and notwithstanding the same, enforcement of the contractual limitations period is barred as a matter of law." CP at 1768 (Conclusions of Law (COL) 10). Thus, it reached the merits of Pease's claims. The trial court did not rule on whether Turner waived its affirmative defenses.

2.      *Overall Findings and Conclusions*

Overall, the trial court found that Pease "sustained its burden of proof for its claim of breach of [the] Subcontract and for damages against Turner." CP at 1765 (FOF 249). It cited "cumulative credible evidence that Turner failed to monitor, adhere to, and adequately coordinate the Project work schedule, failed to timely coordinate [building information modeling, and] blamed other trades for same time frame of project delays and Substantial Completion." CP at 1765 (FOF 249). The trial court also found that Pease did not breach the subcontract.

Despite Turner's breach, the trial court found that Pease's schedule impact claims "were not submitted within the time frame required [by] the Subcontract, specifically Article V and IX." CP at 1766 (FOF 253). Thus, Pease "waived its claims for impact by failing to adhere to the notice requirements of the Subcontract and by endorsing pay requests with releases indicating its claims were then 'zero'" before submitting COP 35. CP at 1766 (FOF 254).

The trial court did not bar all of Pease's claims, however. It found, Pease "notified Turner of impacts and issues in Turner's schedules and additional costs of working directed overtime several times before its delay claim submission." CP at 1766 (FOF 255).

16

The trial court awarded Pease damages for unpaid change orders and overtime, including Gerdau's overtime. But it barred Pease's other claims for failing to comply with the subcontract's notice requirements and for "endorsing conditional and unconditional releases referencing 'zero' additional monetary claims." CP at 1767 (COL 5). The trial court dismissed Pease's claim against Gerdau, while awarding Gerdau its claim against Pease. In later proceedings, Turner agreed to pay Gerdau's claim.

The trial court dismissed all of Turner's counterclaims with prejudice. And the trial court ruled that Pease and Gerdau were prevailing parties and therefore entitled to attorney fees and costs. The trial court found that both Pease's and Gerdau's claims against the Sureties were timely and conformed with all relevant statutory requirements, making the Sureties jointly and severally liable.

D.      *Judgment and Attorney Fees*

The trial court entered a judgment, including interests and costs, for Pease jointly and severally against Turner and the Sureties for roughly $646,000. The trial court also awarded Pease attorney fees of about $1,135,000 against Turner, of which the Sureties were jointly and severally liable for $786,000.

Turner appeals the judgment and award of attorney fees.

ANALYSIS

When reviewing findings and conclusions after a bench trial, "we determine whether substantial evidence supports the court's findings of fact and whether the findings support the conclusions of law." *State v. Eyman*, 24 Wn. App. 2d 795, 818, 521 P.3d 265 (2022), *review denied,* 1 Wn.3d 1021 (2023). "Substantial evidence supports a finding if it is sufficient to

17

persuade a rational, fair-minded person that the finding is true." *Id*. "We view the evidence and all reasonable inferences in the light most favorable to the prevailing party" and do not review the trial court's credibility determinations. *Real Carriage Door Co., Inc. ex. rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). We review only a trial court's findings of fact that a party has assigned error to and treat unchallenged findings as verities on appeal. *Id*.; *Pierce v. Bill & Melinda Gates Found.*, 15 Wn. App. 2d 419, 429, 475 P.3d 1011 (2020). And "[w]e may affirm on any ground the record adequately supports." *Skinner v. Holgate*, 141 Wn. App. 840, 849, 173 P.3d 300 (2007).

## I. TIMELINESS OF THE CLAIM

Turner contends that there is not substantial evidence to support the trial court's finding that Pease timely filed its complaint. Turner reasons that Article XVIII's requirement that "[a]ll claims, suit[s] or demands" be brought within "one year following Subcontractor's achieving substantial completion for the Subcontractor's Work" barred Pease from filing a lawsuit more than one year after it substantially completed its work. Br. of Appellant at 31.[2] Turner insists that Pease substantially completed its work "as early as September 2017, and in no event later than March 2018." Br. of Appellant at 42. Turner also assigns error to the trial court's finding that Pease ended work on the site in May 2018 and argues that the findings do not to support the conclusion that Pease's claim was timely.

Pease responds that because Turner was the sole drafter of the subcontract and Pease was not allowed to negotiate any language, we must construe the subcontract against Turner. Pease emphasizes that the subcontract does not define substantial completion for Pease's work and

---

[2] Turner does not discuss the time limit related to Turner sending a notice of default.

there is no certificate of substantial completion for the concrete work, so it is not clear when the limitation period began to run. We agree with Pease. Under the facts of this case, we construe the subcontract against Turner and hold that Pease timely filed its complaint because it did so within one year of substantial completion for the whole aquarium.

"A court's primary task in interpreting a written contract is to determine the intent of the parties." *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). "If a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations after analyzing the language and considering extrinsic evidence (if appropriate), the provision is ambiguous." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014). Unless the parties drafted the contract together, "[w]e generally construe ambiguities against the contract's drafter." *Id*. Further, when a clause incorporating a prime contract into a subcontract is "general and unlimited . . . both the contract specifications and procedural provisions of the prime contract are incorporated by reference." *Sime Const. Co., Inc. v. Wash. Pub. Power Supply Sys.*, 28 Wn. App. 10, 16, 621 P.2d 1299 (1980).

For the purposes of liability stemming from construction defects, "a construction project is substantially complete if it can be used or occupied for its intended use." *Dania, Inc. v. Skanska USA Bldg. Inc.*, 185 Wn. App. 359, 370, 340 P.3d 984 (2014). "Substantial completion occurs when the entire improvement, and not just a component part, may be used for its intended purpose." *Id*. at 370-71. For example, Division One has held that a condominium was substantially complete when the city issued a certificate of occupancy, even though finishing work remained. *1519-1525 Lakeview Blvd. Condo. Ass'n v. Apt. Sales Corp.*, 101 Wn. App. 923, 932, 6 P.3d 74 (2000). But this court has held that for "contractors who perform final

services on a project, the [statutory] limitations period begins to run from the date their last service was provided, so long as that service gave rise to the cause of action." *Dania*, 185 Wn. App. at 371.

Here, Article XVIII required Pease to bring "[a]ll claims, suit[s] or demands" within "one year following Subcontractor's achieving substantial completion for the Subcontractor's Work." CP at 143. The term "substantial completion" is not defined and does not appear anywhere else in the subcontract, and no one testified about what this term meant for the purposes of Pease's work. And while Pease appears to have completed the overwhelming majority of its work by March 2018, there is no evidence in our record that Turner ever certified that Pease's work was substantially complete. Notably, the prime contract between MetroParks and Turner defined substantial completion as "when the tank exhibits have been completed, tested, commissioned and accepted by the Owner as ready to accept introduction of live marine animal wildlife specimens and the Owner's staff may occupy the building." Ex. 91 at 221. And Article I of the subcontract appeared to incorporate the prime contract by reference and without limitation.

Based on the facts of this case, we hold that Pease timely filed its complaint. Turner was the sole drafter of the subcontract and Pease had to accept the subcontract without modification in order to submit a bid. Because we construe ambiguities against the contract's drafter, we construe the lack of any definition or testimony for "substantial completion for the Subcontractor's Work" against Turner and hold that the limitation period did not begin running until the whole building was substantially complete per the prime contract, even though the Pease subcontract's term referred to the substantial completion of Pease's work. *Viking Bank*, 183 Wn. App. at 713. MetroParks did not accept the aquarium as substantially complete until

June 2018, less than a year before Pease filed this lawsuit. There was no testimony or evidence that Pease's work on the tank exhibits was "completed, tested, commissioned and accepted by the Owner as ready to accept introduction of live marine animal wildlife specimens" before June 2018. Ex. 91 at 221. Thus, under the facts and contractual language in this case, Pease timely filed its complaint.

We hold that there was substantial evidence to support the trial court's finding that Pease timely filed its claim under Article XVIII. And this finding supported the conclusion that Pease's complaint was not time-barred. Because we affirm on this ground, we do not reach Turner's argument that the trial court erred finding that the contract limitation period was unconscionable or Pease's argument that Turner waived this defense.

III. DAMAGE AWARDS

Turner assigns error to the trial court's findings that Pease and Gerdau's overtime costs were incurred at Turner's direction to alleviate delays Turner knew about. Turner also assigns error to the trial court's finding that Pease notified Turner of the cost of overtime, was entitled to overtime under the subcontract, and to findings about the value of Pease and Gerdau's overtime. Turner contends that the trial court's findings that Turner directed Pease to work overtime and knew the costs of Pease working overtime do not support the award.

A. *Notice of Overtime Claims*

Turner argues that the trial court erred by awarding Pease damages for overtime. Turner asserts that, because the trial court found that Pease did not give Turner adequate notice of the impacts charged in COP 35, the trial court should not have awarded Pease the overtime included in COP 35. Turner also reasons that on summary judgment, the trial court ruled "that Pease was

21

bound to comply with the Subcontract's notice and claim requirements, absent excuse or waiver." Br. of Appellant at 55-56. Turner contends that Pease's notices that would track its overtime hours did not comply with the subcontract's notice requirements and that Turner did not waive those notice requirements, thus barring that claim. We disagree.

"In contracts, the specific provisions control over the general provisions." *Foote v. Viking Ins. Co. of Wisconsin*, 57 Wn. App. 831, 834, 790 P.2d 659 (1990); *see also T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 194 Wn.2d 413, 423, 450 P.3d 150 (2019) ("A basic rule of textual interpretation is that the specific prevails over the general.").

Washington "generally requires contractors to follow contractual notice provisions unless those procedures are waived," and a party can waive a notice provision through their conduct. *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375, 386, 78 P.3d 161 (2003). But waiver by conduct "'requires unequivocal acts of conduct evidencing an intent to waive.'" *Id*. (quoting *Absher Constr. Co. v. Kent Sch. Dist. No. 415,* 77 Wn. App. 137, 143, 890 P.2d 1071 (1995)).

Turner relies on *Mike M. Johnson* to argue that Pease could not charge Turner for overtime Turner directed, because that direction triggered other notice provisions in the subcontract that Turner did not waive. In that case, Spokane County hired a contractor to build two sewers, then entered change orders significantly increasing the scope of the contractor's work. *Mike M. Johnson*, 150 Wn.2d at 378-79. The contract had strict "mandatory notice, protest, and formal claim procedures for claims of additional compensation, time extensions, and changed conditions." *Id*. at 379. The Supreme Court held that Spokane County's actual notice of claims requiring additional work not included in the contract did not excuse the contractor

from complying with the contract's notice and claim procedures. *Id.* at 391. The Supreme Court distinguished *Bignold v. King County,* 65 Wn.2d 817, 399 P.2d 611 (1965), where "the owner's knowledge of the changed conditions coupled with its subsequent direction to proceed with the extra work [] evidenced its intent to waive enforcement of the written notice requirements under the contract." *Mike M. Johnson*, 150 Wn.2d at 388. And Division Three has interpreted *Bignold* as only "provid[ing] a supplemental means of recovery when the contract is not applicable." *Gen. Constr. Co. v. Pub. Util. Dist. No. 2 of Grant County*, 195 Wn. App. 698, 710, 380 P.3d 636 (2016). But these cases are distinguishable, because while the subcontract in this case had notice procedures for directives that changed Pease's scope of work, the subcontract provision governing overtime did not require notice of overtime claims.

Here, several subcontract provisions addressed general notice requirements. Article V required Pease to give Turner notice that it needed more time to complete its work within 48 hours of delays that were not Pease's fault. Article IX required Pease to give Turner notice that a directive from Turner changing Pease's scope of work required additional time or money within five days of the directive. Article IX generally addressed directives: Article IX generally addressed directives for any "change, addition and/or omission [] which may otherwise serve as the basis for a request for an increase in Price or extension of time." Br. of Appellant at 63-64. Turner asserts that the directive to work overtime to remedy the delays fell under this article. Thus, Turner reasons that, within five days of Turner's directive to work overtime, Pease had to notify Turner of the costs of overtime. But while Article IX deals with cost changes resulting from changes to the *scope* of work, nothing in the article mentions overtime.

In contrast, Article III specifically addressed overtime. For the claims at issue in this case, the specific provisions of Article III addressing overtime control over Article IX's general notice requirements. *Foote*, 57 Wn. App. at 834. Article III provided that Turner would pay Pease for overtime that Turner ordered as long as Pease was not in default under the subcontract. While Turner sent Pease a notice of default in August 2017, Turner does not argue on appeal that Pease was in default. Turner does not challenge the trial court's various findings that Pease was not responsible for the delays that caused Turner to order Pease to work overtime. Additionally, Turner does not challenge the trial court's findings that it breached the subcontract and that Pease did *not* breach the subcontract. Thus, Pease was not in default and was clearly not required to pay for the overtime under Article III. And Article III did not require Pease to give Turner any special notice about the cost of overtime.

Instead, Article III required that Turner pay Pease overtime to recoup delays that were not Pease's responsibility, Turner directed Pease to work overtime in this case, and nothing in Article III imposed a separate obligation to notify Turner of the costs of working overtime. Because the delays were not Pease's fault and the directive to work overtime to ameliorate those delays did not by itself change Pease's scope of work, the notice provisions in Articles V and IX do not apply to the overtime claim within COP 35.

B.   *Effect of Lien Releases*

The trial court found that Pease waived most of its schedule impact claims by endorsing pay applications that reported "zero" disputed claims before August 2017. Based on that ruling, Turner argues that Pease's overtime claims were similarly barred by the lien releases in Pease's pay applications. Turner asserts that Pease released its claims for work and materials, including

overtime "furnished to the Project through that date." Br. of Appellant at 72. And because all of Gerdau's claimed overtime occurred before August 2017, Turner similarly asserts that we should reverse the award for Gerdau's overtime. We disagree.

First, Pease asserts that Turner waived this defense by failing to raise it between Turner's answer and the trial. "A party is not dilatory in asserting an affirmative defense if it asserts the defense in its answer." *Greenhalgh v. Dep't of Corr.*, 170 Wn. App. 137, 144, 282 P.3d 1175 (2012). And a defendant does not have to include "all defenses with the motion for summary judgment" to avoid waiver. *King v. Snohomish County*, 146 Wn.2d 420, 427, 47 P.3d 563 (2002). But "when a defendant engages in discovery that is inconsistent with the defense, then waiver may be required." *Id.* at 425

Here, Turner's answer broadly asserted that Pease waived its claims. And Turner's responses to interrogatories stated that Pease failed to comply with subcontract notice requirements for its claims and waived its claims by breaching the contract. Turner's actions put Pease on notice that Turner would pursue a waiver defense. Thus, asserting at trial that the lien releases waived Pease's claims was not unduly dilatory or inconsistent with Turner's prior behavior. *King*, 146 Wn.2d at 424; *Greenhalgh*, 170 Wn. App. at 144.

Turning to the merits, "'[a] release is a contract and its construction is governed by contract principles subject to judicial interpretation in light of the language used.'" *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 208, 308 P.3d 597 (2013) (quoting *Nationwide Mut. Fire Ins. Co. v. Watson,* 120 Wn.2d 178, 187, 840 P.2d 851 (1992)). Thus, in interpreting the releases we must determine the intent of the parties. *Id*. at 209.

Turner relies on an unpublished Division Three case, *Exterra, LLC v. Cle Elum Gateway Prop., LLC*, No. 31751-0-III (Wash. Ct. App. Nov. 20, 2014)[3] to assert that Pease waived its overtime claims by failing to identify them in the releases. First, *Exterra* is unpublished and not binding on this court. Second, the release in *Exterra* waived "any claim, cause of action[,] or liability." No. 31751-0-III, slip op. at 3-4. *Exterra*'s release was broader than in this case.

Here, the conditional and unconditional releases stated that Pease released "any mechanic's lien, stop notice, or bond right" it had on the project. 5 RP (Oct. 3, 2022) at 854-55. This was a narrower release than the one at issue in *Exterra*. No. 31751-0-III, slip op. at 3-4. Turner emphasizes that each release stated, "This release covers a progress payment for labor, services, equipment or materials furnished to the Project through [a designated date]." Br. of Appellant at 75. But we construe the "release" in that sentence to refer back to the release of a mechanic's lien, stop notice, or bond right. Interpreting the word "release" to have a completely different definition than the one provided in the preceding sentence would produce an absurd result.

Further, the trial court's finding that Pease waived most of its claims related to the fact that Pease endorsed pay applications indicating "zero" in disputed claims. As discussed above, Turner directed Pease to work overtime and we construe Article III as not requiring separate notice of the cost of working overtime under the circumstances. Thus, there would be no reason to treat overtime as a disputed amount if Pease believed that Turner had agreed to pay for overtime. We hold that the releases in the pay applications did not waive Pease's claim for overtime.

---

[3] 184 Wn. App. 1040, https://www.courts.wa.gov/opinions/pdf/317510.unp.pdf.

We hold that substantial evidence supported the trial court's findings that Pease and Gerdau incurred overtime at Turner's direction, that the overtime was to ameliorate delays not caused by Pease, and that Pease and Gerdau were entitled to compensation under the subcontract. These findings support the trial court's conclusion that Pease's overtime claims were not barred, and that Pease and Gerdau were entitled to damages for overtime.[4]

C.      *Pay-If-Paid Clauses*

Several clauses in Articles V and IX provided that Pease could seek compensation for delays or extra work only "to the limited extent that [Turner] has actually recovered corresponding cost reimbursement, compensation, damages or extensions of time from the Owner under the Contract Documents." CP at 139. Turner asserts that these "pay-if-paid" clauses bar Pease from recovering additional compensation for the delays. Because MetroParks approved only about $165,000 of Pease's proposed change orders, Turner asserts that any amount awarded to Pease in excess of that amount should be reversed. We disagree.

Pease first asserts that Turner waived its "pay-if-paid" defense by failing to raise it before trial. But during discovery, Turner asserted that Pease's claims were offset by "outstanding changes which Turner has approved for payment." CP at 1653. And during trial, Turner asked

---

[4] Additionally, Turner assigns error to the trial courts findings that Pease submitted pay applications covering the time period that Pease claimed impacts from delays, that all of Pease's proposed change order except COP 35 were submitted in compliance with the subcontract, and that the amounts sought in those change orders were reasonable except for the overhead and profit mark-ups. But it does not provide any argument to support these assignments of error. "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010). We need not address these assignments of error.

Pease's project manager questions about the clauses.  Thus, Turner did not waive this argument. *King*, 146 Wn.2d at 424; *Greenhalgh*, 170 Wn. App. at 144.

Nevertheless, the "pay-if-paid" clauses violate several statutes and are void.  RCW 4.24.360 provides: "Any clause in a construction contract" that "purports to waive, release, or extinguish" a contractor or subcontractor's rights "to damages or an equitable adjustment arising out of unreasonable delay in performance which delay is caused by the acts or omissions of the contractee or persons acting for the contractee is against public policy and is void and unenforceable."  Further, RCW 39.10.410 prohibits "Subcontract agreements used by the general contractor/construction manager" from "[r]estrict[ing] the subcontractor's right to damages for changes to the construction schedule or work to the extent that the delay or disruption is caused by the general contractor/construction manager or entities acting for it."  RCW 39.10.410(3). The statutes do not apply to contract provisions requiring parties to give notice of claims or enter into dispute resolution processes.  *Absher*, 77 Wn. App. at 145.  But the Supreme Court has held that RCW 4.24.360 invalidates "'no-damages-for-delay' clauses in construction contracts where the delay is caused by the contractee or 'persons acting for' the contractee."  *Scoccolo Const., Inc. ex rel. Curb One, Inc. v. City of Renton*, 158 Wn.2d 506, 509, 145 P.3d 371 (2006).

Turner argues that the statutes do not "cover claims for additional compensation based on changes or additions" to a subcontractor's work.  Reply Br. of Appellant at 40.  But Turner directed Pease to work overtime in order to complete its original scope of work.  As discussed above, Turner does not challenge the trial court's findings that Turner and other subcontractors caused the delays for which Pease sought damages.  Therefore, by limiting Pease's ability to recover damages for delays that were Turner's fault, the "pay-if-paid" provisions of Article V

28

and IV clearly violate RCW 4.24.360 and RCW 39.10.410, rendering the provisions void and unenforceable. Additionally, Pease is correct that in Turner's settlement with MetroParks, Turner agreed to "have the full and complete responsibility to resolve at its own cost all claims or liens asserted or pursued by [Turner's] employees, Subcontractors[,] or suppliers . . . arising out of or related to the project." Ex. 229 at 3. We hold that the "pay-if-paid" clauses do not limit Pease's recovery.

Turner also asserts that there "were no independent claims or awards against the Sureties," so any action by this court that reduces Pease's judgment against Turner must correspondingly reduce the judgment against the Sureties. Br. of Appellant at 84. Because we do not reduce any award against Turner, we need not reach this question.

## ATTORNEY FEES

### I. ATTORNEY FEES BELOW

Turner argues that we should reverse the trial court's award of attorney fees and costs to Pease. But the trial court correctly ruled that Pease was a prevailing party. *Hawkins v. Diel*, 166 Wn. App. 1, 10, 269 P.3d 1049 (2011). Thus, we affirm the fee award.

### II. ATTORNEY FEES ON APPEAL

Turner seeks its costs of appeal, while Pease seeks both appellate attorney fees and costs.

Turner "requests that the Court award its reasonable costs on appeal pursuant to RAP 14.2." Br. of Appellant at 85. RAP 14.2 provides that this court "will award costs to the party that substantially prevails on review." But Pease was the prevailing party below and we affirm on appeal. We deny Turner's request.

No. 58748-3-II

Pease seeks appellate attorney fees and costs under RAP 18.1(a), RAP 14.2, the subcontract and RCW 4.84.330, RCW 39.08.030, and RCW 60.28.030. RAP 18.1(a) allows this court to award appellate attorney fees "[i]f applicable law" permits.

The subcontract required Pease "to promptly pay all lawful claims" and to indemnify Turner for attorney fees. CP at 147. RCW 4.84.330 provides that any contract provision awarding attorney fees to one party to enforce the contract must be construed to award attorney fees to whichever party prevails. And RCW 39.08.030(b) and RCW 60.28.030 allow a claimant to recover attorney fees against a surety or lien holder. Because we affirm, Pease is the prevailing party on appeal. We award Pease appellate attorney fees and costs.

CONCLUSION

We affirm. We deny Turner's request for appellate costs. We grant Pease's request for appellate attorney fees and costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, J.

Cruser, C.J.

30