# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Parental Rights to:<br><br>M.L.S. | No. 86657-5-I<br>(consolidated with<br>No. 86658-3-I)<br><br>ORDER GRANTING MOTION<br>FOR RECONSIDERATION,<br>WITHDRAWING OPINION,<br>AND SUBSTITUTING<br>OPINION |

The Respondent, Department of Social and Health Services, has filed a motion for reconsideration of the opinion filed on June 9, 2025. The court has determined that the motion should be granted, the opinion withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and it is further

ORDERED that the opinion filed on June 9, 2025 is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed.

Feldman, J.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Parental Rights to:<br><br>M.L.S. | No. 86657-5-I<br>(consolidated with<br>No. 86658-3-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — S.M. and C.S. appeal the trial court's order terminating their parental rights to their child, M.L.S. S.M. argues Washington's termination statutes, RCW 13.34.180 and .190, are unconstitutional as applied to her. Both parents also argue substantial evidence does not support various findings of fact entered by the trial court. We affirm.

I

S.M. is the biological mother of M.L.S. (born in June 2020) and two older children: A.M. (born in June 2017) and R.S. (born in August 2018). C.S. is the biological father of M.L.S. and R.S. Both parents have struggled with chronic substance abuse, and S.M. was abusing substances when all three children were born. As a result of this substance abuse and other parenting deficiencies, S.M.'s parental rights were previously terminated with respect to A.M. and R.S., and

C.S.'s parental rights were previously terminated with respect to R.S. Both A.M. and R.S. have been adopted by S.M.'s sister, T.M.

When M.L.S. was born, he tested positive for amphetamines and opiates and was diagnosed with Neonatal Abstinence Syndrome. Due to these health issues and S.M.'s and C.S.'s struggles with substance abuse, the Department of Children, Youth, and Families (the Department) placed M.L.S. in T.M.'s custody shortly after his birth. Both parents agreed to dependency, and the trial court issued dependency orders in September 2021 finding M.L.S. to be dependent under RCW 13.34.030(6) because he "ha[d] no parent, guardian or custodian capable of adequately caring for [him], such that [he] is in circumstances which constitute a danger of substantial damage to [his] psychological or physical development."

Both dependency orders identified the parents' substance abuse disorders as parental deficiencies. S.M. and C.S. were ordered to undergo drug and alcohol evaluations, complete any recommended treatment programs, and provide negative urinalysis samples. S.M. was also ordered to complete a psychological evaluation and follow all recommended treatments stemming from that evaluation. Additionally, C.S.'s dependency order identified domestic violence perpetration as a parental deficiency and ordered him to complete a domestic violence batterer's assessment and follow all recommended treatments.

During the dependency, S.M. and C.S. were arrested and pleaded guilty to multiple charges stemming from crimes they committed before M.L.S. was born.

2

C.S. has been incarcerated since September 2022 and is expected to be released in May 2030. S.M. has been incarcerated since January 2023, during which time she has achieved sobriety for the first time in many years. S.M. is serving a Drug Offender Sentencing Alternative (DOSA) with an official release date of May 2025. As of M.L.S.'s termination trial, S.M. had applied to participate in a graduated reentry (GRE) program which, if she were accepted, would allow her to serve a portion of her remaining sentence under community supervision beginning as early as May 2024.

In December 2022, the Department petitioned to terminate S.M.'s and C.S.'s parental rights to M.L.S. In February 2024, the trial court held a factfinding trial on the Department's petition and heard testimony from witnesses including S.M., C.S., T.M., S.M.'s mother, the court appointed special advocate (CASA), social workers, and corrections staff. At the close of evidence, the Department requested that the trial court terminate S.M.'s and C.S.'s parental rights so that M.L.S. could be adopted by T.M. The CASA likewise recommended that the trial court grant the State's petition to allow T.M. to adopt M.L.S. S.M., in turn, asked that the court deny the termination petition and prolong the dependency to give her additional time to complete the GRE program and address her parental deficiencies. Lastly, C.S. stipulated that he "chose not to participate in any of his court-ordered services" during M.L.S.'s dependency but nonetheless urged the court to deny the termination petition in order to give S.M. additional time to reunify with M.L.S. The trial court rejected the parents' arguments, granted the

3

Department's petition, and terminated S.M.'s and C.S.'s parental rights to M.L.S. Both parents appeal.

II

A

S.M. raises an as-applied constitutional challenge to RCW 13.34.180 and .190, arguing these statutes violate her fundamental liberty interest in the care, custody, and management of M.L.S. because they "allow the State to terminate parental rights without first showing continuation of the dependency places the child at risk of current tangible harm." We disagree.

Appellate courts review constitutional challenges de novo. *In re Welfare of A.W.*, 182 Wn.2d 689, 701, 344 P.3d 1186 (2015). "Statutes are presumed constitutional, and the challenger of a statute must prove beyond a reasonable doubt that the statute is unconstitutional." *Id.* To succeed in an as-applied challenge to the constitutionality of a statute, the party must show that "application of the statute in the specific context of the party's actions or intended actions is unconstitutional." *City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004). The constitutional right at issue here is a parent's "fundamental liberty interest in the care, custody, and management of their children." *See A.W.*, 182 Wn.2d at 702. Because Washington's statutes governing the termination of parental rights seek to interfere with this fundamental liberty interest, "we examine the termination statutes under the strict scrutiny standard." *In re Dependency of M.-A.F.-S.*, 4 Wn. App. 2d 425, 446, 421 P.3d 482 (2018). Under this standard, a

4

statute is constitutional if it is narrowly tailored to advance a compelling state interest. *Id.* at 448.

Regarding the compelling state interest, "the State has a 'parens patriae' and an 'urgent interest' in the welfare of the child." *Id.* at 445 (internal quotation marks omitted) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 766-67, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)). "[W]hen parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child.'" *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)); *see also In re Dependency of T.C.C.B.*, 138 Wn. App. 791, 796, 158 P.3d 1251 (2007) ("In termination proceedings, the State has a compelling interest in preventing harm or the risk of harm to the child."). Thus, a parent's fundamental liberty interest in the care, custody, and management of their children "is not absolute." *K.M.M.*, 186 Wn.2d at 477. In balancing these competing interests, our legislature has declared, "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

To advance this compelling state interest, our legislature has enacted a two-step statutory framework for terminating parental rights. *K.M.M.*, 186 Wn.2d at 478. "The first step focuses on the adequacy of the parents, while the second step looks at the child's best interests." *Id.* Under the first step, the Department must

prove by clear, cogent, and convincing evidence the six statutory elements listed in RCW 13.34.180(1), including "(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future" and "(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.190(1)(a)(i).[1] Additionally, due process principles require the court to "make a finding of current unfitness before parental rights can be terminated." *K.M.M.*, 186 Wn.2d at 479. "Satisfying all six of the statutory elements [under RCW 13.34.180(1)] raises an implied finding of parental unfitness." *Id.* The second step in the termination analysis requires the Department to prove by a preponderance of the evidence that termination is "in the best interests of the child." RCW 13.34.190(1)(b).

Washington courts have repeatedly held that RCW 13.34.180 and .190 are narrowly tailored to advance the State's compelling interest in preventing harm or the risk of harm to the child. *See, e.g., M.-A.F.-S.*, 4 Wn. App. 2d at 444-55; *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 256-57, 237 P.3d 944 (2010); *In re Welfare of M.R.H.*, 145 Wn. App. 10, 30-31, 188 P.3d 510 (2008); *T.C.C.B.*, 138 Wn. App. at 796-803; *In re Welfare of C.B.*, 134 Wn. App. 336, 344-45, 139 P.3d 1119

---

[1] The four other elements, not challenged by the parents on appeal, are "(a) That the child has been found to be a dependent child;" "(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;" "(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;" and "(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1).

(2006); *In re Dependency of I.J.S.*, 128 Wn. App. 108, 118, 114 P.3d 1215 (2005). Relevant here, our court has concluded the statutes are narrowly tailored because "the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights." *I.J.S.*, 128 Wn. App. at 118; *see also C.B.*, 134 Wn. App. at 345 ("Although [RCW 13.34.190] does not expressly employ the 'prevention of harm to the child' standard, the State necessarily demonstrates that termination of parental rights is required to prevent harm or risk of harm to the child when it shows that all six factors [under RCW 13.34.180(1)] are satisfied.").

Notwithstanding this extensive body of case law upholding the constitutionality of the termination statutes, S.M. raises several arguments in support of her broad assertion that the statutes are unconstitutional because they permit the State to terminate parental rights without first showing continuation of the dependency places the child at risk of "current tangible harm." We recently rejected a nearly identical set of arguments in *In re Dependency of L.A.H.*, No. 81456-7-I (Wash. Ct. App. May 10, 2021) (unpublished), *review denied*, 198 Wn.2d 1025, 497 P.3d 350 (2021), https://www.courts.wa.gov/opinions/pdf/814567.pdf,[2] where a mother appealing from the termination of her parental rights argued RCW 13.34.180 and .190 were unconstitutional as applied to her. We address each such argument and our corresponding holding in *L.A.H.* below.

---

[2] Although *L.A.H.* is an unpublished opinion, we may properly cite and discuss unpublished opinions where, as here, doing so is "necessary for a reasoned decision." *See* GR 14.1(c)). We adopt the reasoning of *L.A.H.* as stated in the text above.

First, S.M. argues "[u]nder the strict scrutiny standard, the State's regulation of a fundamental right is presumptively unconstitutional" and "[i]t is the State's burden to show the termination statutes are narrowly tailored to meet a compelling interest." The mother in *L.A.H.* similarly asserted that "because her constitutional challenge involves a fundamental right, strict scrutiny applies[,] . . . we should presume that the termination statutes are unconstitutional[,] . . . . [and] the Department bears the burden of establishing that the termination statutes, as applied, survive strict scrutiny." *Id.* at 9 n.8. The *L.A.H.* court rejected this argument because "our Supreme Court has explained that '[i]n Washington, it is well established that statutes are presumed constitutional and that . . . the challenger must prove that the statute is unconstitutional beyond a reasonable doubt.'" *Id.* (quoting *Sch. Districts' All. for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 605, 244 P.3d 1 (2010)). The *L.A.H.* court also recognized that the Court of Appeals has "repeatedly presumed RCW 13.34.180 and .190 to be constitutional in the context of both facial and as-applied constitutional challenges to these statutes." *Id.* (collecting cases).

Second, S.M. cites to *In re Dependency of T.L.G.*, 139 Wn. App. 1, 156 P.3d 222 (2007), and asserts that "[i]n the context of dependency and termination proceedings, harm is established by showing a 'current concrete risk' to the child" and "[t]he alleged risk of harm must be tangible, not merely theoretical or speculative." Likewise, the mother in *L.A.H.* cited to *T.L.G.* for the proposition that "the State has a compelling interest in terminating parental rights only when there

exists a *concrete* risk of harm to the child." *L.A.H.*, No. 81456-7-I, slip op. at 11. The *L.A.H.* court distinguished *T.L.G.* because that case concerned parental visitation with children during a dependency as opposed to termination of parental rights. *Id.* at 12. The *L.A.H.* court explained that in the latter context, "The State's interest is not limited to protecting against a *current, concrete* risk of harm to the child." *Id.* at 14.

Third, S.M. argues because "M.L.S. is in a stable placement where he was thriving, and there is no identifiable risk that this placement [with T.M.] will disrupt [his wellbeing]," there is no "urgent need to obtain speedy permanency to protect his wellbeing." The mother in *L.A.H.* similarly argued that "the Department cannot meet its burden of establishing the requisite risk of harm to a child when the child is in a stable placement where he is thriving." *Id.* at 13-14 (internal quotation marks omitted). The *L.A.H.* court disagreed based on the statutory framework of chapter 13.34 RCW, which "emphasizes not only a child's right to permanency, but also the need for a speedy resolution of dependency proceedings." *Id.* at 14-15 (citing RCW 13.34.020;[3] RCW 13.34.180(1)(e);[4] RCW 13.34.145(1)(b);[5] RCW

---

[3] This statute states, "The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter."
[4] This statute provides, "A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."
[5] This statute states "a permanency planning hearing shall take place no later than 12 months . . . following the date of removal" and "[e]very effort . . . be made to provide stability in long-term placement, and to avoid disruption of placement, unless the child is being returned home or it is in the best interest of the child."

13.34.145(1)(c)[6]).   We also noted that, in light of this statutory scheme, "'continuation of the dependency rather than termination of parental rights would impede, not facilitate, the goal of permanency by effectively prolonging the limbo of foster care.'"  *Id.* at 16 (internal quotation marks omitted) (quoting *M.-A.F.-S.*, 4 Wn. App. 2d at 453).

As the above comparison demonstrates, these three arguments raised by S.M. in the present appeal are virtually indistinguishable from the arguments we rejected in *L.A.H.*  Even though *L.A.H.* thoroughly discusses these arguments, S.M. fails to discuss or even mention *L.A.H.* in her appellate briefs.  When asked about *L.A.H.* at oral argument, S.M.'s counsel contended we should depart from our prior opinion "because it's wrong."  Wash Ct. of Appeals oral argument, *In re Parental Rights to M.L.S.*, No. 86233-2-1 (Apr. 15, 2025), at 2 min., 0 sec. to 3 min., 5 sec. (on file with court).  We decline to do so.  *L.A.H.* is well-reasoned, persuasive, and supported by Washington Supreme Court precedent.[7]  We therefore reject the foregoing arguments for the same reasons set forth in *L.A.H.*

Lastly, S.M. argues the termination statutes are unconstitutional as applied to her because the Department "relie[d] on speculation about possible future harm

---

[6] This statute provides, "Permanency planning goals should be achieved at the earliest possible date, preferably before the child has been in out-of-home care for 15 months."

[7] For example, while S.M. contends the Washington Court of Appeals "has chronically misinterpreted binding precedence as to the correct constitutional presumption in cases involving substantive due process challenges involving parental rights," our Supreme Court has applied the "beyond a reasonable doubt" standard discussed in the text above to a challenge to chapter 13.36 RCW—governing the establishment of a guardianship for a dependent child—based on the same constitutional right at issue here, namely parents' "fundamental liberty interest in the right to the care, custody, and management of their children."  *See A.W.*, 182 Wn.2d at 701.  The Court of Appeals is bound by this Supreme Court precedent.  *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006).

to M.L.S. ground[ed] in generalizations" and "has not shown via clear, cogent, and convincing evidence that delaying adoption poses an actual risk to M.L.S.'s safety, health, or wellbeing."  The *L.A.H.* court rejected this argument under a similar factual scenario involving termination of parental rights to a 2-year-old child.  The trial court in *L.A.H.* found that the mother was severely addicted to and still using methamphetamine; that she did not make progress in her substance abuse treatment; that "[i]f the mother did all of her services, starting now, it would be a minimum of 12 to 18 months before the mother could safety engage in reunification;" that her "long term addiction to methamphetamines" impaired her ability to participate in the dependency proceedings relating to her other children; that the child was "in a stable home" with a family that was "willing to be permanent and adopt" the child just as it had adopted his two older siblings; that the child had been out of the home for over two years; and that the child had never lived with the mother.  *Id.* at 16-17.  Based on these findings, we concluded the termination statutes were not unconstitutional as applied to the mother because the Department proved that "continuation of the parent-child relationship posed the requisite risk of harm to L.A.H."  *Id.* at 17.

Our analysis in *L.A.H.* is instructive as to S.M.'s argument.  As in *L.A.H.*, the evidence adduced at M.L.S.'s termination trial—much of which S.M. does not dispute—shows termination was necessary to prevent harm or the risk of harm to M.L.S.  S.M.'s lengthy struggle with substance abuse caused the Department to institute dependency proceedings against all three of her children.  The trial court

entered an unchallenged finding that S.M. has not "maintained a meaningful role in [M.L.S.'s] life" while in custody and "was just now reestablishing her relationship with [M.L.S.]." The trial court entered another unchallenged finding that even if S.M. fully reintegrated into the community following her release from prison by completing all court ordered services and achieving sobriety, "[s]he will not be ready to safely parent [M.L.S.] until at least a year past [M.L.S.'s] near future" of two months (*i.e.*, 14 months). And like the child in *L.A.H.*, M.L.S. has been removed from S.M.'s care for over three years, has never lived with S.M., and has lived virtually his entire life with his current caregiver, T.M., who also cares for M.L.S.'s two siblings.

To be sure, S.M. appears to have demonstrated a greater willingness to address her substance abuse issues during the dependency than the mother in *L.A.H.* The record indicates that, as of the termination trial, S.M. had maintained sobriety since she became incarcerated and was participating in (but had not yet completed) a substance abuse program in her current facility. But the trial court also entered an unchallenged finding that "as much as [S.M.] has made progress under the confines of the various facilities she has been at, [she] still does not recognize how strong her addiction issue is. Recovery is a very difficult process outside the facility and it is doubtful that [S.M.] currently has the skills necessary to address her thinking regarding use." This unchallenged finding, like the other unchallenged findings discussed above, are verities on appeal. *See A.W.*, 182 Wn.2d at 711. Further, other courts have similarly upheld termination orders where

an incarcerated parent with a history of substance abuse issues was unable to establish they could consistently remain sober after release. *See, e.g., In re Welfare of E.D.*, 195 Wn. App. 673, 690-92, 381 P.3d 1230 (2016).

The trial court here found the Department had proven the elements under RCW 13.34.180(1); both parents were currently unfit to parent M.L.S.; and termination was in the best interests of M.L.S. under RCW 13.34.190(1)(b). C.S. and S.M. do not challenge many of these findings, and the findings they do challenge are supported by substantial evidence for the reasons discussed in section II(B) below. By holding the Department to its evidentiary burden under RCW 13.34.180 and .190, the trial court ensured termination of S.M.'s parental rights was necessary to prevent harm or the risk of harm to M.L.S. Accordingly, S.M. has not met her burden of showing that RCW 13.34.180 and .190, as applied to her, are not narrowly tailored to advance a compelling state interest. We therefore reject her constitutional challenge to those statutes.

B

S.M. and C.S. challenge three findings of fact entered by the trial court. In general, we review trial court findings for substantial evidence. *In re Dependency of A.M.F.*, 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022). In the first step in the termination analysis, which focuses on the adequacy of the parents, the State must prove the six elements under RCW 13.34.180(1) by clear, cogent, and convincing evidence. *K.M.M.*, 186 Wn.2d at 478 (citing RCW 13.34.190(1)(a)(i)). We affirm a trial court's findings as to these statutory elements where "the ultimate fact at

13

issue is shown to be 'highly probable.'" *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 754, 487 P.3d 960 (2021) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). As to the second step in the termination analysis, which focuses on the child's best interests, the State must prove that termination is in "the best interests of the child" by a preponderance of the evidence. *K.M.M.*, 186 Wn.2d at 479 (citing RCW 13.34.190(1)(b)). This standard is satisfied where there is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *J.D.P.*, 17 Wn. App. 2d at 754. Additionally, trial courts are afforded broad discretion in termination proceedings, and their decisions are "entitled to great deference on review." *Id.* We do not reweigh evidence or reassess the credibility of witnesses, and "we view the evidence and reasonable inferences drawn from it in the light most favorable to the prevailing party." *A.M.F.*, 23 Wn. App. 2d at 141. We apply these legal principles to each of the challenged findings below.[8]

---

[8] S.M. also appears to challenge the trial court's determination of parental unfitness by assigning error to the court's finding stating (relevant to S.M.) that "[b]oth parents are both currently unfit to parent [M.L.S.]" because "[b]oth have the current parental deficiency of substance use disorder issues that is not remedied" and "[t]his deficiency results in them not being able to be a consistent presence in [M.L.S.'s] life, committing crimes to support substance use that results in incarceration and failing to ensure [M.L.S.'s] emotional and physical needs are being met." But S.M. fails to support this assignment of error with any argument pertaining to the court's finding of parental unfitness. To the contrary, S.M. appears to concede throughout her brief that she was unfit to parent M.L.S. at the time of the termination trial, at one point acknowledging she "needs some time to complete her sentence and prove her sobriety in the community." Given S.M.'s briefing on this issue, she has waived this potential assignment of error. *See L.N.B.-L.*, 157 Wn. App. at 243-44 ("An appellant waives an assignment of error when she presents no argument in support of the assigned error."). We therefore decline to address this argument.

1

C.S. argues substantial evidence does not support the trial court's finding that M.L.S.'s "near future is two months" for purposes of RCW 13.34.180(1)(e). We disagree.

In termination proceedings, RCW 13.34.180(1)(e) requires the Department to prove "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."  The meaning of the phrase "near future" is determined "from the child's point of view," *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004), and "depends on the age of the child and the circumstances of the placement," *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005).  "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future." *In re Welfare of A.G.*, 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

*In re Welfare of C.B.*, 134 Wn. App. 942, 143 P.3d 846 (2006), is instructive on determining a child's near future.  In that case, the trial court found that the near future of three children between the ages of one- and seven-years-old was six months to one year.  *Id.* at 946-47, 954.  Relevant to this finding, the children's therapist testified the children would be "developmentally impacted if they waited another year in foster care," they "needed a sense of permanency," and they were bonded with foster parents who had cared for them for over a year and intended on adopting them.  *Id.* at 951, 954.  Based on this testimony, Division Two of this

15

court concluded, "This is sufficient evidence to convince a reasonable trier of fact that it is highly probable that the children needed a permanent placement within six months to a year." *Id.* at 954.

The Department here presented similar testimony at M.L.S.'s termination trial. The CASA testified that M.L.S. was bonded to T.M., who had cared for him during the entire three-year dependency period and intended on adopting him just as she had previously adopted S.M.'s other two children. The CASA also testified that continuation of the parent-child relationship would impact M.L.S.'s integration into a stable and permanent home because he would not be "legally-free . . . to be adopted into a home that can provide for his needs and give him that stability." The CASA explained that if M.L.S. were not adopted, he would be "living in uncertainty" and at risk of "confusion" as he grew older because he would be "labeled" differently than his adopted siblings and prevented from establishing permanency in his community.

The Department also presented the testimony of a social worker, who similarly testified,

> [I]t's important for [M.L.S.] to know whether he will remain in the one and only home he's ever known with his siblings, with his aunt, who has provided for all of his care. It's important for him to have the security and predictability of . . . what his life will be.

This social worker then testified that the near future of a three-and-a-half-year-old child like M.L.S. is "no more than two months," noting "a child of that age typically can't grasp something that's happening longer than that." As in *C.B.*, the testimony

16

here shows it is highly probable that M.L.S.'s near future, at the time of the termination trial, was two months.

C.S. argues the above evidence "consisted of speculative, general testimony regarding children of M.L.S.'s age" and was not "specific to M.L.S.'s near future." This argument is both factually and legally unconvincing. Factually, the CASA provided testimony specific to M.L.S. when she stated that he "loves Hulk," that he "spend[s] a lot of time costume changing," and that his "future is . . . when I get home from school, can I put on my Hulk costume." Legally, numerous Washington cases have determined a child's near future by comparing them to children of similar ages. *See, e.g., M.R.H.*, 145 Wn. App. at 28 ("A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency."); *In re Dependency of A.W.*, 53 Wn. App. 22, 32, 765 P.2d 307 (1988) (holding one year was not within near future of three-year-old and noting, "Although 1 year may not be a long time for an adult decisionmaker, for a young child it may seem like forever."); *In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983) (holding eight months not in near future of 4-year-old and noting, "Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.") (quoting J. GOLDSTEIN, A. FREUD, & A. SOLNIT, *Beyond the Best Interests of the Child* 43 (1973)). Based on this case law and the CASA's testimony that M.L.S. was "meeting all of his developmental milestones," the trial court could

reasonably rely on evidence regarding children of a similar age to M.L.S. in determining his near future.

More fundamentally, C.S.'s argument fails because he does not challenge the trial court's other findings indicating he could not have timely remedied his parental deficiencies even if M.L.S.'s near future was longer than two months. The trial court found M.L.S. "would have to wait over seven years for his father to be even available to physically parent him, due to [his] incarceration," and such a time period is "well beyond the 2 month period that is [M.L.S.'s] near future." The trial court also found C.S. had shown a "total lack of engagement in any of his court ordered services throughout the life of the dependency." This evidence shows C.S. had little likelihood of remedying his parental deficiencies during any time period.

Substantial evidence also supports the trial court's "near future" finding as it relates to S.M. The trial court found that even if S.M. achieved early, supervised release into the community and remained sober, she still "will not be ready to safely parent [M.L.S.] until at least a year past M.L.S.'s near future" of two months. Additionally, the trial court found that S.M. "still does not recognize how strong her addiction issue is" and "it is doubtful that [she] currently has the skills necessary to address her thinking regarding use." Thus, even if M.L.S.'s near future was 14 months, the record shows there is little likelihood that S.M. could remedy her parental deficiencies during that time period. Washington cases have upheld trial courts' near future findings under similar circumstances. *See*, *e.g.*, *E.D.*, 195 Wn.

18

App. at 690-92 (6 months was not within near future of 18-month-old child where incarcerated mother serving a DOSA sentence had not demonstrated a sustained period of success in treating her substance abuse in society). Additionally, under RCW 13.34.180(1)(e), "A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." On this record, substantial evidence supports the trial court's finding that M.L.S.'s future was two months.

2

Next, C.S. argues substantial evidence does not support the trial court's finding that "[g]uardianship is not available as a permanent option" for M.L.S. for purposes of RCW 13.34.180(1)(f). We disagree.

In determining whether the Department has shown under RCW 13.34.180(1)(f) that continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home, the trial court "must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child." RCW 13.34.180(1)(f). "Whether guardianship is a viable alternative to termination is a case-specific determination, considering factors relevant to the best interests of the child." *In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 173, 535 P.3d 451 (2023). Even if a guardianship is available, "'there will be

19

circumstances under which termination, rather than guardianship, is the appropriate course of action.'" *Id.* (quoting *In re Welfare of R.H.*, 176 Wn. App. 419, 429, 309 P.3d 620 (2013)); *see also In re Dependency of A.V.D.*, 62 Wn. App. 562, 570, 815 P.2d 277 (1991) (noting that guardianship is an "inherently temporary situation" that keeps a child in "limbo" because the parent can "come back many years later and seek to have the guardianship terminated on the ground that [they are] finally able to care for [the child]").

We recently analyzed an analogous situation in *G.C.B.* At the termination trial in that case, the father proposed that his children remain with their current caregivers and that he "slowly integrate [him]self into the [children's] lives and establish a relationship with them." 28 Wn. App. 2d at 163. The trial court rejected the father's proposal, finding that the Department "made efforts to support the permanent option of guardianship with the caregivers" but that adoption was nonetheless "in the best interest of the child[ren]" due to the "lack of parent child relationship" and because "[t]he current placement, with whom the child[ren] [have] been placed for over [three] years, is not interested in being a guardian and would like to adopt." *Id.* at 172-73.

On appeal, we concluded substantial evidence supported the above finding based on testimony from several witnesses. A Department caseworker testified that "the children were thriving in their current placement and a guardianship would keep them in limbo with negative consequences." *Id.* at 174 (internal quotation marks omitted). The guardian ad litem similarly testified that adoption (rather than

guardianship) was in the children's best interest because they had lacked stability for several years during the dependency and the father had shown "no ability to parent" and had "no relationship or bond" with the children. *Id.* at 174-75 (internal quotation marks omitted). And the current caregiver to the children testified that her family "discussed the potential for guardianship or adoption with the Department" but "her family preferred adoption and that their home had already been approved for adoption." *Id.* (internal quotation marks omitted).

Similarly here, the trial court entered a detailed finding of fact regarding the Department's efforts to support a guardianship and whether a guardianship was available as a permanent option for M.L.S.:

> [M.L.S.] is adoptable and has prospects for adoption. The Department met with [M.L.S.'s] life-long caregiver, [T.M.], and fully informed her about the options of guardianship and adoption. The Department made all possible efforts to support a guardianship and there was nothing the Department could do to make the caregiver choose guardianship over adoption. Guardianship is not available as a permanent option for [M.L.S.] as the caregiver was not interested in guardianship as she wants to adopt [M.L.S.], just like she has done with his sister [A.M.] and intends to do with his brother [R.S.].

As in *G.C.B.*, this finding shows the trial court appropriately considered the Department's efforts to support a guardianship and whether a guardianship was available as a permanent option for M.L.S.

The trial court's finding is also supported by testimony similar to the testimony in *G.C.B.* A social worker believed adoption was in M.L.S.'s best interests because "[h]e's been in the same stable family, relative placement with his siblings since birth." Likewise, the CASA considered whether a guardianship

21

would be appropriate for M.L.S. but ultimately recommended that he be adopted by T.M., noting "we have a maternal relative who is . . . ready to adopt [M.L.S.]. . . . and the family have decided that . . . . guardianship is not the best thing, that the adoption is the way they want to go." Lastly, T.M.—M.L.S.'s life-long caregiver— testified that the Department "provided [her with] information about guardianship and adoption as options for permanency," had "all of [her] questions about these two options answered," "identif[ied] adoption as the option that [she] wanted to pursue," and there was nothing "[she] or the Department could have done to fix the reason that [she] chose not to do a guardianship." Similar to *G.C.B.*, substantial evidence supports the trial court's finding that the Department made efforts to support a guardianship and that a guardianship was not available as a permanent option for M.L.S.

C.S.'s contrary arguments lack merit. He contends the Department failed to introduce evidence showing it considered any individuals other than T.M., such as S.M.'s mother, for a potential guardianship. The record shows otherwise. A social worker testified she was unaware of "any relatives or suitable adults who are willing to do a guardianship with the mother or father for M.L.S." And the record does not indicate that S.M.'s mother offered to assume T.M.'s caretaking responsibilities over M.L.S. and serve as his guardian. To the contrary, C.S.'s attorney represented to the trial court during the termination trial that S.M.'s mother "is not being proffered as a placement at this point in time," and S.M.'s attorney joined in this representation. This testimony refutes C.S.'s argument that the

22

Department failed to consider whether there was a viable guardianship option for M.L.S. with someone other than T.M.

C.S. also asserts "[t]he fact that a caregiver would prefer to adopt a child does not make a guardianship unavailable" and "[m]ore must be required before a guardianship can be deemed unavailable." We rejected a similar argument in *In re Dependency of N.B.G.*, 31 Wn. App. 2d 311, 320, 551 P.3d 1045 (2024), noting "nothing in [RCW 13.34.180(1)(f)] requires the trial court to compel [the proposed adoptive caretaker] to serve as a guardian if she does not want to." Nor does the statute require prospective adoptive parents to explain why they prefer adoption over guardianship. In *G.C.B.*, we upheld the trial court's finding under RCW 13.34.180(f) where the child's caretaker explained, similar to T.M., that "[s]he [and] her family preferred adoption and that their home had already been approved for adoption." 28 Wn. App. 2d at 175 (internal quotation marks omitted).

At bottom, the trial court considered the Department's efforts to support a guardianship and whether guardianship was available as a permanent option, but ultimately found that continuation of the parent and child relationship clearly diminished M.L.S.'s prospects for early integration into a stable and permanent home via adoption by his life-long caregiver, T.M. Substantial evidence supports the trial court's findings relating to RCW 13.34.180(1)(f).

3

Lastly, C.S. argues substantial evidence does not support the trial court's finding that "[t]ermination is in the best interest of [M.L.S.]" for purposes of RCW 13.34.190(1)(b). We disagree.

In termination proceedings, the best interests of the child analysis focuses on "whether the parent-child relationship should continue." *J.D.P.*, 17 Wn. App. 2d at 760. "'The criteria for establishing the best interests of the child are not capable of exact specification because each case is largely dependent upon its own facts and circumstances." *Id.* (quoting *In re Dependency of J.S.*, 111 Wn. App. 796, 804, 46 P.3d 273 (2002)). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] s[eeks] to rehabilitate." *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (quoting *A.W.*, 53 Wn. App. at 33).

The trial court found "[t]ermination is in the best interest of [M.L.S.]" because he "has been with his maternal aunt, [T.M.], almost his whole life" and "should not be required to wait well over a year for [S.M.] to be able to safely parent him." This finding is supported by substantial evidence for many of the same reasons discussed in section II(A) above relating to the harm or risk of harm to M.L.S. that would result from continuation of the dependency. It is undisputed that at the time of the termination trial M.L.S. had been out of the home for over three years and

during this time had lived in a stable placement with his maternal aunt and two siblings.  The trial court found that S.M. "will not be ready to safely parent [M.L.S.]" for over a year after the termination proceedings while she attempted to successfully reintegrate into society and remain sober, which was uncertain.  Prolonging the dependency proceedings further would have kept M.L.S. in limbo for an indefinite time period.  The CASA also testified that termination of parental rights was in M.L.S.'s best interest.  On this record, the Department presented evidence in sufficient quantum to persuade a fair-minded person that termination was in the best interests of M.L.S.

S.M. does not meaningfully dispute that termination of her parental rights was in the best interests of M.L.S. based on established Washington case law interpreting RCW 13.34.190(1)(b).  Instead, S.M. insists we depart from this "antiquated" case law based on an "emerging awareness" that "often it is far better for the child to maintain a relationship with a currently unfit parent than to terminate ostensibly for the sake of permanency."  In support of this argument, S.M. relies heavily on Justice Madsen's dissenting opinion in *In re Parental Rights to D.H.*, 195 Wn.2d 710, 740-41, 464 P.3d 215 (2020) (Madsen, J., dissenting), which urged our Supreme Court to "reexamine [its] approach to termination" based on a "changing tide in child welfare legislation" and "mounting evidence on family separation . . . demonstrat[ing] . . . that removal is simply not worth the crippling, long-term consequences to children or their parents."

25

S.M.'s argument is unconvincing for two reasons. First, Justice Madsen's dissenting opinion in *D.H.* is inapposite because it does not address the second step in the termination analysis, which examines whether termination was in the best interests of the child. Instead, the focus of the dissent is whether the Department satisfied its statutory obligation under RCW 13.34.180(1)(d) to provide all necessary and court ordered services to the parent, *id.* at 729, which is not disputed here. Second, to the extent Justice Madsen's dissent pertained to the best interests of the child analysis, the majority opinion in *D.H.* ultimately held that the child's "need [for] a safe, stable, and permanent home" outweighed the benefits of continuing the parental relationship despite the parent having "made consistent efforts to improve as a parent." *Id.* at 728. We may not disregard directly controlling authority of the Supreme Court majority in favor of a dissenting opinion S.M. believes is better reasoned. *See Gen. Constr. Co. v. Pub. Util. Dist. No. 2 of Grant County*, 195 Wn. App. 698, 708-09, 380 P.3d 636 (2016) ("[A] dissenting opinion is not law. . . . We are bound by the majority opinion . . . .").

Affirmed.

Feldman, J.

WE CONCUR: